UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JILL KLASKIN, Individually and on Behalf of The MITRE Corporation Tax Sheltered Annuity Plan and Qualified Retirement Plan and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>THE MITRE CORPORATION, MITRE BOARD OF TRUSTEES, JASON PROVIDAKES, ALFRED GRASSO, WILSON WANG, JEAN MILBRANDT, MARK KONTOS, DONALD M. KERR, MIKE ROGERS, GEORGE CAMPBELL JR., LANCE R. COLLINS, NICHOLAS M. DONOFRIO, DAVID FUBINI, GEORGE C. HALVORSON, PAUL G. KAMINSKI, YVETTE MELÉNDEZ, CATHY E. MINEHAN, JOHN NOSEWORTHY, ADALIO T. SANCHEZ RODNEY E. SLATER, JAN TIGHE, and JOHN DOES 1-20,<br><br>Defendants. | Civil Action No. _____<br><br>CLASS ACTION<br><br>**COMPLAINT FOR LIABILITY UNDER ERISA** |

Plaintiff Jill Klaskin ("Plaintiff") individually and on behalf of all others similarly situated, brings this action by and through her undersigned attorneys based upon personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys.  This investigation included, among other things, a review of U.S. Department of Labor ("DOL") and Securities and Exchange Commission ("SEC") filings by The Mitre Corporation ("MITRE" or the "Company"), defined contribution plan documents, media reports about the Company, and an analysis of available fund and investment information.  Plaintiff believes substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      Plaintiff brings this action individually, on behalf of classes of all participants in the MITRE Corporation Tax Sheltered Annuity Plan ("TSA") and Qualified Retirement Plan ("QRP," collectively, the "Plans" or the "MITRE Retirement Program") from September 4, 2015 to December 31, 2020 (the "Class Period"), and on behalf of the Plans, for breach of fiduciary duty pursuant to Sections 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§1109 and 1132 against MITRE and the other fiduciaries of the Plans (collectively, "Defendants").  As alleged herein, Defendants have breached their fiduciary duties with respect to the Plans to the detriment of the Plans and their participants and beneficiaries.

2.      MITRE describes itself as a not-for-profit organization working in the public interest across governments, industry, and academia, and maintains one of its two principal locations in Bedford, Massachusetts.  The Plans are defined contribution plans under Section 403(b) (TSA) and 401(a) (QRP) of the Internal Revenue Code ("IRC") and are offered to employees of MITRE.  During the Class Period, the MITRE Retirement Program offered participants the opportunity to invest with "two investment fund families" including: (1) Fidelity

Investments, which offers mutual fund, general account insurance investments, and collective investment trust investments; and (2) TIAA (defined below, formerly TIAA-CREF), which offers CREF mutual funds and TIAA annuity investments.

3.      ERISA, which regulates the operation of the Plans, requires their fiduciaries to act prudently and solely in the interest of the Plans' participants and beneficiaries.  To safeguard against imprudence and disloyalty in defined contribution plans, ERISA imposes strict duties of loyalty and prudence upon plan fiduciaries.  ERISA §404(a)(1), 29 U.S.C. §1104(a)(1).  When structuring the Plans and selecting investments, fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. §1104(a)(1), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope.  29 U.S.C. §1104(a)(1)(B).  Plan fiduciaries are required to act with undivided loyalty, act prudently, and defray reasonable plan expenses.  29 U.S.C. §1104(a)(1).  The duties of loyalty and prudence are "the highest known to the law" and require fiduciaries to have "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982); *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996) (citation omitted); *LaScala v. Scrufari*, 479 F.3d 213, 219 (2d Cir. 2007).

4.      Under 29 U.S.C. §1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obliged to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), §7.  Furthermore, "The Restatement [of Trusts] . . . instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in

monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts §90, cmt. b) ("*Tibble II*").

5.     To meet their fiduciary obligations, the Plans' fiduciaries are required to establish and maintain a prudent process when selecting and monitoring the Plans' investment options and establishing and evaluating expenses.  Defendants, however, breached their fiduciary duties by engaging in a flawed and imprudent process and failing to act in the best interest of participants in the Plans.

6.     As discussed herein, Defendants breached their fiduciary duties by failing to manage and operate the Plans in a prudent manner or in the best interests of the Plans or participants.  First, Defendants failed to utilize a prudent process or methodology when selecting and monitoring the investment options for the Plans.  The lack of a prudent process or methodology is demonstrated by, among other things, the following: (i) Defendants failed to implement a prudent selection process for investment options in the Plans, shifting the burden to participants to choose from an overwhelming number of options; (ii) Defendants selected and continued to offer underperforming funds in the Plans; (iii) the vast number of investment options in the Plans rendered it infeasible for the fiduciaries to adequately and prudently review and analyze each of the investment options offered to the Plans' participants; (iv) Defendants included relatively costly funds in the Plans, despite lower-cost alternatives and an excess of investment options already in the Plans; and (v) Defendants imprudently structured the Plans' payment of administrative and recordkeeping fees, and retained more than one recordkeeper, resulting in redundant services and overpayment by the Plans.

7.     Prudent and impartial plan sponsors must establish and follow procedures to monitor both the performance and cost of the investments selected for their plans and investigate

alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants. Defendants' failures to offer prudent investment options were the result of failures of effort or of competence, either of which was in violation of their fiduciary duties under ERISA. Defendants' actions were contrary to those of a reasonable fiduciary and cost the Plans and their participants millions of dollars. Defendants' mismanagement of the Plans constitutes a breach of the fiduciary duties of prudence, in violation of 29 U.S.C. §1104. Based on this conduct, Plaintiff asserts claims against Defendants for breach of the fiduciary duties, co-fiduciary liability and failure to monitor fiduciaries.

## JURISDICTION AND VENUE

8.      Plaintiff brings this action pursuant to 29 U.S.C. §1132(a), which provides that participants or beneficiaries in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duty and other violations of ERISA for monetary and appropriate equitable relief.

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, because it is a civil action arising under the laws of the United States, and exclusive jurisdiction under ERISA §502(e)(1), 29 U.S.C. §1132(e)(1).

10.      This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

11.      Venue is proper in this District pursuant to ERISA §502(e)(2), 29 U.S.C. §1132(e)(2), because the Plans are administered in this District, many violations of ERISA took place in this District, and Defendants may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. §1391(b) because MITRE maintains one of its two principal locations in this District, the Form 5500 filings for the Plans list the Plan sponsor as being located

in this District, and a substantial part of the events or conduct giving rise to the claims asserted herein occurred within this District.

## PARTIES

**Plaintiff**

12.     Plaintiff Jill Klaskin resides in Alexandria, Virginia and was a participant in the MITRE Retirement Program during the Class Period.

13.     Plaintiff has standing to bring this action on behalf of the Plans because she participated in the Plans, suffered financial harm and has been injured by Defendants' unlawful conduct as described herein.

14.     Plaintiff did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

15.     Much of the information necessary to evaluate the process – or lack thereof – engaged in by the Plans' fiduciaries on behalf of the Plans are within the exclusive control of MITRE.  Over the course of several months prior to the filing of this action, Plaintiff requested the production of documents by MITRE pursuant to §104(b)(4) of ERISA.  MITRE produced various non-public documents, which were relied upon by Plaintiff's counsel in connection with the claims alleged herein.  MITRE, however, refused to produce numerous documents setting forth procedures for the Plans' fiduciaries in connection with the structuring, monitoring, or administration of the Plans, such as meeting minutes, presentations or analyses of the investment options or expenses.

16.     Accordingly, Plaintiff did not have actual knowledge of the details of Defendants' decision-making process concerning the Plans, including their processes, or lack thereof, for selecting, monitoring, and removing the Plans' investments.  This information is solely within the

possession of Defendants prior to discovery.  *See Braden v. Wal-Mart Stores, Inc*., 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systemically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").  Plaintiff, lacking Defendants' experience in managing large retirement plans, lacked actual knowledge of reasonable fee and expense levels and prudent alternatives available to such plans.  For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based upon, among other things, the facts set forth herein.

**Defendants**

**The Company**

17.    Defendant MITRE was founded in Bedford, MA in 1958 and maintains one of its two principal offices in Bedford, Massachusetts.  MITRE is the Plan sponsor, Plan Administrator, and named fiduciary for the Plans, as described in both the QRP Plan Document and TSA Plan Document and Summary Plan Description ("SPD"), which governs both Plans (collectively, "Plan Documents").  MITRE is also listed as the Plans' sponsor in the Plans' Form 5500s filed during the Class Period.  MITRE, and established an office in McLean, VA in 1963.  MITRE describes its Bedford, MA office, as well as its McLean, VA office, as its "two principal locations" with additional sites across the country and abroad.[1]

(a)    MITRE describes itself as a not-for-profit organization which works in the public interest across federal, state, and local governments, as well as industry and academia. MITRE operates federally funded research and development centers ("FFRDCs"), which assist the

---

[1]    *See Locations and Directions*, MITRE, https://www.mitre.org/about/corporate-overview/locations-and-directions (last visited Aug. 31, 2021).

United States government with scientific research and analysis, development, and acquisition, and has an independent research program.  MITRE has over 8,200 employees.

(b)     MITRE, acting through its officers and employees, performs discretionary Plan-related fiduciary functions, including the selection of investment options for the Plans and the negotiation and agreement over services and fees for the Plans.  As the Administrator of the Plans (designated in the Plan Documents) and the Plan sponsor (designated in the Form 5500s), MITRE is responsible for the administration and operation of the Plans and has exercised many duties and responsibilities in connection with the operation of the Plans.  Defendant MITRE is a fiduciary within the meaning of ERISA Section 3(21)(A), 29 U.S.C. §1002(21)(A).

(c)     MITRE, as the Administrator of the Plans, has the general responsibility to control and manage the operation of the Plans and has the power to adopt rules and procedures to govern participant investment elections and directions under the Plan.

(i)     The QRP Plan Administrator's responsibilities include, but are not limited to, the following: (a) to make and enforce such rules and regulations as it deems necessary or proper for the efficient administration of the QRP, including claims and review procedures; (b) to interpret the QRP; (c) to decide all questions concerning the QRP and the eligibility of any person to participate in the QRP; (d) to compute the amount of benefits which will be payable to any Participant or other person in accordance with the provisions of the QRP, and to determine the person or persons to whom such benefits will be paid; (e) to authorize the payment of benefits and administrative expenses; (f) to keep such records and submit such filings, elections, applications, returns or other documents or forms as may be required under the Code and applicable regulations, or under state or local law and regulations; (g) to reconcile and correct any errors or inconsistencies in the QRP; (h) to appoint such accountants, actuaries, consultants, counsel, recordkeepers, and

other agents as may be required to assist in administering the QRP; and (i) to allocate and delegate its fiduciary responsibilities under the QRP and to designate other persons, including a committee, to carry out any of its fiduciary responsibilities under the QRP, any such allocation, delegation, or designation to be by written instrument and in accordance with Section 405 of ERISA.

(ii)      The TSA Plan Administrator's responsibilities include, but are not limited to, the following: (a) to make and enforce such rules and regulations as it deems necessary or proper for the efficient administration of the TSA, including claims and review procedures; (b) to interpret the TSA, its interpretation thereof in good faith to be final and conclusive on all persons claiming benefits under the TSA; (c) to decide all questions concerning the Plan and the eligibility of any person to participate in the Plan; (d) to compute the amount of benefits which will be payable to any Participant or other person in accordance with the provisions of the TSA, and to determine the person or persons to whom such benefits will be paid; (e) to authorize the payment of benefits; (f) to keep such records and submit such filings, elections, applications, returns or other documents or forms as may be required under the Code and applicable regulations, or under state or local law and regulations; (g) to reconcile and correct any errors or inconsistencies in the TSA; (h) to appoint such accountants, actuaries, consultants, counsel, record-keepers and other agents as may be required to assist in administering the TSA; and (i) to allocate and delegate its fiduciary responsibilities under the TSA and to designate other persons, including a committee, to carry out any of its fiduciary responsibilities under the TSA, any such allocation, delegation, or designation to be by written instrument and in accordance with Section 405 of ERISA.

(d)      In the TSA, MITRE has the "exclusive power to determine which annuity contracts and mutual fund custodial accounts are available for investment under the Plan from time to time."

(e)    In the QRP, MITRE has "the exclusive power to determine which Investment Accounts (and which vehicles within such Investment Accounts) are available under the Plan from time to time."

**MITRE Executive Defendants**

18.    MITRE is led by a "team of executives[,]" a "board of trustees[,]" "a select group of Fellows[,]" and "Visiting Fellows[.]"[2]  As stated in the Plan Documents: "The Chief Executive Officer of the Company or the Chief Financial Officer of the Company shall each be authorized to act on behalf of the Company in its capacity as Administrator[.]"  Upon information and belief, the following officers were delegated responsibilities with respect to the Plans and were thereby fiduciaries of the Plans during the Class Period within the meaning of ERISA Section 3(21)(A), 29 U.S.C. §1002(21)(A):

(a)    Defendant Dr. Jason Providakes has served as the President and Chief Executive Officer ("CEO") of MITRE since 2017, and has also served as a member of the MITRE Board of Trustees since 2017.

(b)    Defendant Alfred Grasso served as the President and CEO of MITRE during the Class Period, from 2006 to 2017.

(c)    Defendant Wilson Wang has served as the Vice President, Chief Financial Officer ("CFO") & Treasurer of MITRE since January 2, 2019.

(d)    Defendant Jean Milbrandt has served as the Vice President, CFO & Treasurer of MITRE during the Class Period, beginning in October, 2017.

---

[2]    *See Leadership*, MITRE, https://www.mitre.org/about/leadership (last visited Aug. 31, 2021).

(e)    Defendant Mark Kontos served as the Vice President, CFO & Treasurer of MITRE from 2005 to 2017.

19.    The defendants listed in ¶18 are collectively referred to herein as the "MITRE Executive Defendants."

**MITRE Board of Trustees Defendants**

20.    Upon information and belief, defendant MITRE Board of Trustees has exercised duties and responsibilities in connection with the operation of the Plans, and exercised control over the administration of the Plans.  The Plan Documents state that the MITRE Board of Trustees "may designate a person or persons (including a committee) to carry out any fiduciary responsibilities of the Company or the Board under the Plan[.]"  Defendant MITRE Board of Trustees is therefore a fiduciary within the meaning of ERISA Section 3(21)(A), 29 U.S.C. §1002(21)(A).

21.    The following individuals served on the MITRE Board of Trustees at times relevant herein and are fiduciaries of the Plan:

(a)    Dr. Donald M. Kerr has served as the chairman of the Board of Trustees since 2018.  He first joined the Board in 2009.

(b)    Mike Rogers has served as vice chairman of the Board since 2018.  He first joined the Board in 2016.

(c)    Dr. George Campbell Jr. has served on the Board since 2011.

(d)    Dr. Lance R. Collins has served on the Board since 2018.

(e)    Nicholas M. Donofrio has served on the Board since 2010.

(f)    David G. Fubini has served on the Board since 2014.

(g)    George C. Halvorson has served on the Board since 2014.

(h)    Dr. Paul G. Kaminski has served on the Board since 2017.

    (i)    Yvette Meléndez has served on the Board since 2018.

    (j)    Cathy E. Minehan served on the Board from 2009 to 2012, and since 2016.

    (k)    Dr. John Noseworthy has served on the Board since 2020.

    (l)    Executive Defendant Dr. Jason Providakes has served on the Board since 2017.  He has also served as President and CEO of MITRE since 2017.

    (m)    Adalio T. Sanchez has served on the Board since 2018.

    (n)    Rodney E. Slater has served on the Board since 2015.

    (o)    Vice Admiral Jan Tighe has served on the Board since 2019.

22.    The defendants listed in ¶¶20-21 are collectively referred to herein as the "MITRE Board of Trustees Defendants."

**John Doe Defendants**

23.    To the extent that there are additional employees of MITRE or other persons, committees, or entities who were fiduciaries of the Plans during the Class Period, the identities of whom are currently unknown to Plaintiff, Plaintiff reserves the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" defendants 1-20 include other individuals, including, but not limited to, MITRE employees, directors, and committees who were fiduciaries of the Plans within the meaning of 29 U.S.C. §§1002(21) and/or 1102(a)(1) during the Class Period.

## THE PLANS

24.    The Plans, collectively referred to as the "MITRE Retirement Program" in the SPD, are "defined contribution" plans within the meaning of ERISA Section 3(34), 29 U.S.C. §1002(34).  The TSA is intended to qualify under Section 403(b) of the Internal Revenue Code, and the QRP is intended to qualify under Section 401(a) of the Internal Revenue Code.  The Plans became effective on August 1, 1981 and are maintained by MITRE.  Employees of MITRE

(excluding co-op, seasonal, temporary, on-call, leased, and MITRE global employees) are eligible to participate in the Plans.

25.     Under the Plans, participants may elect to have a portion of their salary deposited directly into an account on a pre-tax basis.  Participants may also make contributions in the form of a rollover of funds from another qualified plan.  In addition, participants may be eligible to receive an additional employer contribution to the Plans on the participant's behalf.  The benefits available to participants under the Plans are based solely upon the amounts contributed to their accounts, and any income, expenses, gains and losses, will be allocated to a participant's account. Consequently, retirement benefits provided by the Plans are based solely on the amounts allocated to each individual's account.

26.     The use of the Plans' funds is intended to be solely in the interest of participants. For example, the QRP Plan Document states: "Subject to the provisions of Sections 3.4, 5.3, and 13.3, no part of the corpus or income of the Trust Fund will be used for or diverted to purposes other than for the exclusive benefit of each Participant and his or her Beneficiary, and for the payment of expenses of administering the Plan and Trusts."

27.     In the TSA, each participant will at all times have a fully vested and nonforfeitable interest in his or her accumulations under annuity contracts and mutual fund custodial accounts.

28.     In the QRP, each participant who first became an employee prior to January 1, 1994 or who was an employee on or after January 1, 1998 will have a fully vested interest in their "Share of the Trust Fund" (the portion of assets held under any Trust which is allocated to the accounts of the participant by MITRE) and in his or her accumulations, if any, under individual TIAA and/or CREF annuity contracts.

29.    The Plan Documents state that the "'identified plan fiduciary' shall be the Administrator, with the assistance of the Corporate Benefits Office and such other offices, employees and persons as may be set forth in the disclosure and other procedural materials prepared by the Administrator relating to the investment of contributions."

30.    According to the Plan Documents, MITRE is the designated Plan Administrator under the Plans and is the named fiduciary of the Plan.  The CEO or CFO of MITRE are each authorized to act on behalf of MITRE in its capacity as Plan Administrator.  MITRE may delegate its duties, powers or responsibilities to one or more persons, and has the power to name another person or persons as a named fiduciary.  The Plan Documents also state that defendant MITRE Board of Trustees "may designate a person or persons (including a committee) to carry out any fiduciary responsibilities of the Company or the Board under the Plan[.]"

31.    Upon information and belief, MITRE delegated its responsibilities as Administrator and fiduciary of the Plans to at least one or more people during the Class Period.  The SPD states that "[t]he Plan Administrator administers the Plan with assistance from third party providers."

(a)    Teachers Insurance and Annuity Association of America ("TIAA") has served as the recordkeeper of the QRP since April 2006, and performs various administrative and brokerage functions.

(b)    Fidelity Investments Institutional Operations Company, Inc. ("Fidelity") has served as the recordkeeper of the TSA since February 1999, and performs various administrative and brokerage functions.

32.    During most of the Class Period, the Plans offered over 200 investment options, most of which were affiliated with Fidelity or TIAA.  As alleged herein, the inclusion of so many options, including a large amount of underperforming and relatively expensive funds, was the

result of a faulty and imprudent process by the Plans' fiduciaries.  Additionally, Defendants failed

to act in the best interest of the Plans' participants and breached their fiduciary duties by  loading

the Plans with a large number of Fidelity and TIAA investment options (to the benefit of Fidelity

and TIAA) and failing to adequately monitor those investments.

### DEFENDANTS' FIDUCIARY DUTIES UNDER ERISA

33.     ERISA requires every plan to provide for one or more named fiduciaries who will

have "authority to control and manage the operation and administration of the plan."  ERISA

§402(a)(1), 29 U.S.C. §1102(a)(1).

34.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under

§402(a)(1), 29 U.S.C. §1102(a)(1), but also any other persons who in fact perform fiduciary

functions.  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority

or discretionary control respecting management of such plan or exercises any authority or control

respecting management or disposition of its assets, (ii) he renders investment advice for a fee or

other compensation, direct or indirect, with respect to any moneys or other property of such plan,

or has any authority or responsibility to do so, or (iii) he has any discretionary authority or

discretionary responsibility in the administration of such plan."  ERISA §3(21)(A)(i), 29 U.S.C.

§1002(21)(A)(i).

35.     As described in the Parties section above, Defendants were fiduciaries of the Plans

because:

        (a)     they were so named;

        (b)     they exercised authority or control respecting management or disposition of

the Plans' assets;

        (c)     they exercised discretionary authority or discretionary control respecting

management of the Plans; and/or

(d)    they had discretionary authority or discretionary responsibility in the administration of the Plans.

36.    ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as fiduciaries of the Plans.  These duties, which require fiduciaries to act "solely in the interest of [plan] participants and beneficiaries," 29 U.S.C. §1104(a)(1), are "the 'highest known to the law.'" *Howard*, 100 F.3d at 1488 (citation omitted); *LaScala*, 479 F.3d at 219.  Section 1104(a)(1) states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A)    for the exclusive purpose of:
>
> (i)    providing benefits to participants and their beneficiaries; and
>
> (ii)    defraying reasonable expenses of administering the plan;
>
> (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . .

29 U.S.C. §1104(a)(1).

37.    According to the DOL, the "primary responsibility of fiduciaries is to run the plan solely in the interest of participants and beneficiaries and for the exclusive purpose of providing benefits and paying plan expenses."[3]  Thus, ERISA fiduciaries "must avoid conflicts of interest" and "may not engage in transactions on behalf of the plan that benefit parties related to the plan, such as other fiduciaries, services providers or the plan sponsor."  *Id*.  The duty of loyalty prohibits fiduciaries from acting in service of their own interests or those of a third party to the detriment of

---

[3]    *See* DEPARTMENT OF LABOR, *Fiduciary Responsibilities*, https://www.dol.gov/general/topic/retirement/fiduciaryresp (last visited Aug. 19, 2020) (emphasis added).

plan participants, including by charging or allowing to be charged excessive fees in plan investment options.

38.    ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 419 (2014) (citation omitted).  This means that ERISA fiduciaries must discharge their responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters" would use.  29 U.S.C. §1104(a)(1)(B).  As the UPIA observes: "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obliged to minimize costs."  UPIA §7 cmt.

39.    In addition to a duty to select prudent investments, a fiduciary under ERISA "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments[.]" *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015).  Indeed, in *Tibble*, the Court held that "an ERISA fiduciary's duty is 'derived from the common law of trusts,'" and that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones[,]" referencing the UPIA, treatises, and seminal decisions confirming the duty.  *Id*. at 528-529.  If an investment is imprudent, the plan fiduciary "'must dispose of it within a reasonable time.'"  *Id*. at 530 (citation omitted).  Fiduciaries therefore may be held liable for either assembling an imprudent menu of investment options or for failing to monitor the plan's investment options to ensure that each option remains prudent.

40.    ERISA also imposes co-fiduciary duties on plan fiduciaries for participating in, enabling or failing to remedy a breach by another fiduciary.  Section 1105(a) states, in pertinent part, that:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2)    if, by his failure to comply with section 404(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

41.    Although ERISA fiduciaries must act "in accordance with the documents and instruments governing the plan," that duty exists only "insofar as such documents and instruments are consistent with" the other duties imposed upon fiduciaries by ERISA.  29 U.S.C. §1104(a)(1)(D).  "This provision makes clear that the duty of prudence trumps the instructions of a plan document, such as an instruction to invest exclusively in employer stock even if financial goals demand the contrary."  *Dudenhoeffer*, 573 U.S. at 421.

42.    Because ERISA is derived from trust law, the Supreme Court has stated that courts should seek guidance from trust law where ERISA is silent.  *Tibble*, 575 U.S. at 529; *Varity Corp v. Howe*, 516 U.S. 489, 496-97 (1996).

## SUBSTANTIVE ALLEGATIONS

**Defendants Failed to Follow a Prudent Process of Reviewing, Selecting, and Monitoring an Appropriate Group of Investment Options for the Plans**

43.    An important function of plan fiduciaries is to investigate, select, and monitor a prudent assortment of investment options to enable plan participants to invest their money for

retirement.  According to the SPD, the purpose of the Plans is to "help [Plan participants] build an accumulation of money for [their] retirement."  The SPD stresses that "the challenge to participants is to understand the complexity of [the Plans'] structure with [their] various parts and investment options."  Defendants, however, failed to follow a process that could achieve those stated goals. Defendants did not employ a careful and thoughtful process to select, offer, or monitor prudent investment options.

44.    Rather than evaluating and selecting the Plans' investment options through a careful and prudent process serving the best interests of the Plans' participants, Defendants indiscriminately placed a large number of mostly TIAA and Fidelity-affiliated investment products in the Plans and thereby failed to limit the number of offerings to an amount that was manageable by either the Plans' participants or the fiduciaries themselves.

45.    During the Class Period, the Plans offered approximately 290 different investment options.  This was more than 10 times the average number of investment options in large defined contribution plans.[4]  The 403(b) Fee Notice sent to participants and dated November 2020 ("November 2020 Fee Brochure") highlights 120 Fidelity funds offered in the TSA Plan, with an overwhelming number of duplication among funds.  The sheer number of options rendered it unnecessarily difficult for participants to evaluate their investment options, violating the well-recognized industry principle that too many choices harms participants and leads to "decision

---

[4]    *See The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans*, BRIGHTSCOPE at 27 (2019), https://www.ici.org/pdf/19_ppr_dcplan_profile_401k.pdf ("On average, large 401(k) plans in the BrightScope Defined Contribution Plan Database offered participants 27 investment options in 2016[.]").

paralysis."[5]   Making matters worse, a large number of the funds offered had performed poorly, were imprudent, and should have been removed from the Plans or never offered in the first place.

46.     The Plans' fiduciaries, therefore, in breach of their fiduciary duties, abrogated their crucial function of selecting and offering a prudent group of investment options.   The Plans' fiduciaries delegated their responsibilities to the Plans' participants themselves even though many lacked the financial expertise to cull through the large number of options to select the most appropriate investments.[6]   Fiduciaries cannot discharge their duties "by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them."   *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009).

47.     Furthermore, the lack of a prudent process is also shown by an examination of the types of funds offered in the Plans.   Instead of offering a limited number of choices in typical investment categories, the Plans offered an excessive number of funds in numerous categories. The Plans include duplicative investments in nearly every major asset class and investment style, including (approximately): balanced/asset allocation (over 12 options, excluding target date funds), sector equity funds (over 40 options), large growth (over 8 options), large blend and large

---

[5]      *See, e.g.*, Michael Liersch, *Choice in Retirement Plans: How Participant Behavior Differs in Plans Offering Advice, Managed Accounts, and Target-Date Investments,* T. ROWE PRICE RETIREMENT                RESEARCH,                at                2                (2009), http://www.behavioralresearch.com/Publications/Choice_in_Retirement_Plans_April_2009.pdf ("Offering too many choices to consumers can lead to decision paralysis, preventing consumers from making decisions.").

[6]      *See* Ian Ayres & Quinn Curtiss, *Beyond Diversification: The Pervasive Problem of Excessive Fees and Dominated Funds in 401(k) Plans*, 124 YALE L.J. 1476 at 1481 (2015), https://www.yalelawjournal.org/pdf/c.1476.Ayres-Curtis.1552_6gag5s3c.pdf   ("It   is   well established that some investors naively diversify by spreading their plan investments across all fund offerings.").

value (over 10 options), international (over 15 options), small cap domestic equities (over 7 options), real estate (over 5 options), money market (over 12 options), and target date investments (2 fund families from Fidelity, Strategic Advisers Multi-Managers funds, and 2 fund families from TIAA). Plan participants were forced to select investment options from among too many choices and created an environment ripe for "decision paralysis[.]"[7] Importantly, the excessive number of funds rendered it unfeasible that Defendants could have prudently examined or monitored each investment option.

48.    Limiting the number of investment options would have provided participants with an ample selection of investment styles while maintaining a larger pool of assets in each style, benefitting participants in the Plans by both avoiding confusion and allowing the Plans to potentially obtain lower fees. A benefit of being an extremely large plan in terms of assets is that plan participants pool assets within the investment options and the large amount of assets in each fund provides negotiating leverage to the Plans with respect to fees, share classes and other items. The excessive number of investment options offered by the Plans, however, negatively impacted the Plans' negotiating leverage because participants' investments were diluted among a large number of options.

**Defendants Selected and Maintained Underperforming Investment Options in the Plans**

49.    During the Class Period, Defendants selected and continued to offer a significant number of imprudent investments affiliated with the Plans' recordkeepers, TIAA and Fidelity. While the selection of such a large number of funds benefitted TIAA and Fidelity, it negatively impacted Plan participants because many performed poorly or were relatively costly.

---

[7]    *See supra*, note 5.

50.     According to the SPD, "a variety of Fidelity's funds are available under the Program.  They span a wide spectrum of investments from conservative options to more speculative, growth-oriented funds."  Had Defendants performed a careful and prudent analysis of the Plans' investments, they would not have included or would have removed many of the Plans' investment options as a result of poor performance or inappropriate risk levels.

51.     As of September 2020, *approximately 40%* of funds in the Plans (116 out of 291) underperformed their respective benchmarks and peers in the trailing 3-year and 5-year periods. Below is a sample of funds that were imprudently offered in the Plans during the Class Period:

| Investment Option | Morningstar Category | +/- Benchmark for 3 Year Returns[8] | +/- Benchmark for 5 Year Returns |
|---|---|---|---|
| Fidelity Asset Manager 50% | Allocation--30% to 50% Equity | -33.72% | -56.31% |
| Fidelity Asset Manager 60% | Allocation--50% to 70% Equity | -30.03% | -52.08% |
| Fidelity Balanced (K) | Allocation--50% to 70% Equity | -19.90% | -33.03% |
| Fidelity Export & Multinational | Large Value | -11.17% | -22.94% |
| Fidelity Global Balanced | Large Blend | -22.59% | -26.002% |
| Fidelity Global Commodity Stock | Natural Resources | -61.09% | -76.26% |
| Fidelity Leveraged Company Stock | Mid-Cap Blend | -7.78% | -11.36% |
| Fidelity New Millennium | Large Blend | -7.33% | -7.19% |
| Fidelity Puritan | Allocation--50% to 70% Equity | -18.69% | -31.43% |
| Fidelity Real Estate Income | Real Estate | -36.10% | -44.07% |
| Fidelity Real Estate Investment Portfolio | Real Estate | -15.12% | -14.17% |
| Fidelity Strategic Dividend & Income | Allocation--70% to 85% Equity | -22.79% | -26.16% |
| Fidelity Telecom & Utilities | Utilities | -28.58% | -29.05% |
| TIAA-CREF Enhanced Large-Cap Growth Index | Large Growth | -5.21% | -6.56% |
| TIAA-CREF Mid-Cap Growth (Inst) | Mid-Cap Growth | -7.39% | -11.92% |

---

[8]     Returns for the three-year and five-year periods are as of October 2015.

52.    Defendants failed to establish or follow a prudent process for monitoring the performance of funds in the Plans, as shown by the above funds remaining in the Plans.

53.    Additionally, numerous Fidelity Select funds were offered in the TSA, and a vast number of them performed exceedingly poorly, as illustrated below:

| Investment Option | Morningstar Category | +/- Benchmark for 3 Year Returns[9] | +/- Benchmark for 5 Year Returns |
|---|---|---|---|
| Fidelity Select Banking | Financial | -4.74% | -9.48% |
| Fidelity Select Chemicals | Natural Resources | -16.75% | -8.43% |
| Fidelity Select Consumer Staples | Consumer Defensive | -16.51% | -14.83% |
| Fidelity Select Energy | Equity Energy | -59.05% | -81.06% |
| Fidelity Select Energy Services | Equity Energy | -75.20% | -109.97% |
| Fidelity Select Financial Services | Financial | -9.07% | -32.19& |
| Fidelity Select Gold | Equity Precious Metals | -122.8% | -164.75% |
| Fidelity Select Materials | Natural Resources | -36.08% | -52.61% |
| Fidelity Select Natural Gas | Equity Energy | -72.58% | -107.163% |
| Fidelity Select Natural Resources | Equity Energy | -65.74% | -93.66% |
| Fidelity Select Utilities | Utilities | -26.08% | -33.60% |

54.    These funds, often referred to as "sector funds," invest in a highly specific area of the total investment market, often limited by geography or a particular type of company. Sector funds can be broad (investing in an entire sector, such as the technology sector) or more narrowly focused. While sector funds provide the opportunity to profit from trends, they are generally more volatile and riskier than broader stock funds, and thus usually result in greater advances in value or steeper declines in value. Maintaining a large amount of poorly performing, volatile funds in the Plans was imprudent and a disservice to participants in the Plans.

---

[9]    Returns for the three-year and five-year periods are as of October 2015.

55.     As is commonly recognized, non-sector-specific actively managed funds are rarely able to outperform passively managed funds.[10]    Passively managed funds with comparable investment strategies charge lower fees, and coupled with better long-term performance, can increase retirement savings by more than six figures over the course of a career.  *Id.*  The higher risk and cost of sector funds are even less appropriate for retirement savings.  Defendants breached their fiduciary duties by offering over 40 sector funds, which increased the risks to Plan participants while at the same time negatively impacting returns.

56.     As illustrated below, a substantial number of Fidelity funds consistently underperformed their benchmarks during the Class Period:

| Fund | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|
| Fidelity Asset Manager 60% | -0.53% | 6.76% | 16.39% | -6.61% |
| *Benchmark: XIUSA04G92* | *1.41%* | *11.98%* | *21.84%* | *-4.38%* |
| Fidelity Asset Manager 70% | -0.55% | 7.07% | 18.70% | -7.66% |
| *Benchmark: XIUSA04G92* | *1.41%* | *11.98%* | *21.84%* | *-4.38%* |
| Fidelity Asset Manager 85% | -0.58% | 7.38% | 22.28% | -9.22% |
| *Benchmark: XIUSA04G92* | *1.41%* | *11.98%* | *21.84%* | *-4.38%* |
| Fidelity Balanced (K) | 0.50% | 7.13% | 16.62% | -3.93% |
| *Benchmark: XIUSA04G92* | *1.41%* | *11.98%* | *21.84%* | *-4.38%* |
| Fidelity Convertible Securities | -9.34% | 5.97% | 9.65% | -1.48% |
| *Benchmark: XIUSA00147* | *-2.98%* | *10.42%* | *13.71%* | *0.16%* |
| Fidelity Disciplined Equity (K) | 0.26% | 6.33% | 21.69% | -9.97% |
| *Benchmark: XIUSA04G92* | *1.41%* | *11.98%* | *21.84%* | *-4.38%* |

---

[10] *See* Johanna Bennett, *Morningstar: Active Fund Managers Suffer*, BARRON'S (Aug. 19, 2016), https://www.barrons.com/articles/morningstar-active-fund-managers-suffer-1471614330.

| Fund | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|
| Fidelity Dividend Growth (K) | -0.50% | 8.19% | 20.22% | -7.09% |
| *Benchmark: XIUSA04G92* | *1.41%* | *11.98%* | *21.84%* | *-4.38%* |
| Fidelity Export & Multinational (K) | 0.97% | 10.10% | 21.07% | -7.14% |
| *Benchmark: XIUSA04G92* | *1.41%* | *11.98%* | *21.84%* | *-4.38%* |
| Fidelity Floating Rate High Income | -1.16% | 9.91% | 3.91% | 0.06% |
| *Benchmark: FOUSA08Q0G* | *0.11%* | *10.35%* | *4.32%* | *0.59%* |
| Fidelity Focused High Income | -1.95% | 10.94% | 6.98% | -2.94% |
| *Benchmark: XIUSA04END* | *-1.14%* | *13.43%* | *7.25%* | *-2.58%* |
| Fidelity Growth & Income (K) | -2.18% | 16.22% | 17.05% | -8.85% |
| *Benchmark: XIUSA04G92* | *1.41%* | *11.98%* | *21.84%* | *-4.38%* |
| Fidelity Mega Cap Stock | -1.42% | 13.65% | 17.77% | -7.22% |
| *Benchmark: XIUSA04G92* | *1.41%* | *11.98%* | *21.84%* | *-4.38%* |
| Fidelity Mid Cap Enhanced Index | -2.42% | 13.48% | 18.40% | -11.71% |
| *Benchmark: XIUSA000L2* | *-2.45%* | *13.82%* | *18.49%* | *-9.06%* |
| Fidelity Mid Cap Value | -4.55% | 12.39% | 16.98% | -18.85% |
| *Benchmark: XIUSA000KY* | *-4.79%* | *20.02%* | *13.34%* | *-12.27%* |
| Fidelity New Millennium | -3.18% | 14.94% | 20.06% | -7.00% |
| *Benchmark: XIUSA04G92* | *1.41%* | *11.98%* | *21.84%* | *-4.38%* |
| Fidelity Puritan (K) | 1.83% | 5.20% | 18.86% | -4.16% |
| *Benchmark: XIUSA04G92* | *1.41%* | *11.98%* | *21.84%* | *-4.38%* |
| Fidelity Real Estate Income | 1.75% | 10.22% | 7.30% | -0.65% |
| *Benchmark: XIUSA04G92* | *1.41%* | *11.98%* | *21.84%* | *-4.38%* |
| Fidelity Real Estate Investment Portfolio | 5.95% | 7.77% | 4.28% | -3.97% |
| *Benchmark: XIUSA04G92* | *1.41%* | *11.98%* | *21.84%* | *-4.38%* |
| Fidelity Select Air Transportation | -8.59% | 20.03% | 24.34% | -12.45% |

| Fund | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|
| *Benchmark: XIUSA04G92* | *1.41%* | *11.98%* | *21.84%* | *-4.38%* |
| Fidelity Select Automotive | 0.17% | -5.84% | 23.96% | -13.54% |
| *Benchmark: XIUSA04G92* | *1.41%* | *11.98%* | *21.84%* | *-4.38%* |
| Fidelity Select Banking | 0.65% | 26.85% | 12.66% | -18.27% |
| *Benchmark: XIUSA04G92* | *1.41%* | *11.98%* | *21.84%* | *-4.38%* |
| Fidelity Select Energy | -20.54% | 33.85% | -2.63% | -24.92% |
| *Benchmark: XIUSA04G92* | *1.41%* | *11.98%* | *21.84%* | *-4.38%* |
| Fidelity Select Energy Services | -26.42% | 36.58% | -12.69% | -44.11% |
| *Benchmark: XIUSA04G92* | *1.41%* | *11.98%* | *21.84%* | *-4.38%* |
| Fidelity Select Environment and Alternative Energy | -4.58% | 20.73% | 25.26% | -13.43% |
| *Benchmark: XIUSA04G92* | *1.41%* | *11.98%* | *21.84%* | *-4.38%* |
| Fidelity Select Financial Services | -3.90% | 18.66% | 20.95% | -15.85% |
| *Benchmark: XIUSA04G92* | *1.41%* | *11.98%* | *21.84%* | *-4.38%* |
| Fidelity Select Gold | -17.90% | 47.30% | 8.62% | -12.99% |
| *Benchmark: XIUSA04G92* | *1.41%* | *11.98%* | *21.84%* | *-4.38%* |
| Fidelity Select Natural Gas | -36.82% | 48.44% | -15.65% | -25.35% |
| *Benchmark: XIUSA04G92* | *1.41%* | *11.98%* | *21.84%* | *-4.38%* |
| Fidelity Select Natural Resources | -21.64% | 30.25% | -0.11% | -24.22% |
| *Benchmark: XIUSA04G92* | *1.41%* | *11.98%* | *21.84%* | *-4.38%* |

57.    Additionally, a large number of TIAA funds consistently underperformed their benchmarks during the Class Period:

| Fund | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|
| CREF Equity Index (None / R3) | 0.24% | 12.49% | 20.84% | -5.37% |
| *Benchmark: XIUSA000O6* | *0.47%* | *12.76%* | *21.13%* | *-5.25%* |

| Fund | 2015 | 2016 | 2017 | 2018 |
|------|------|------|------|------|
| CREF Global Equities (None / R3) | -0.34% | 5.11% | 24.81% | -12.36% |
| *Benchmark: XIUSA04EXL* | *-2.36%* | *7.86%* | *23.96%* | *-9.41%* |
| CREF Growth (None / R3) | 6.46% | 2.92% | 31.83% | -2.46% |
| *Benchmark: XIUSA000KO* | *5.68%* | *7.09%* | *30.22%* | *-1.51%* |
| CREF Inflation-Linked Bond | -1.68% | 4.23% | 1.85% | -0.49% |
| *Benchmark: XIUSA04G7X* | *-1.42%* | *4.68%* | *3.01%* | *-1.25%* |
| TIAA-CREF Bond Index (Inst) | 0.53% | 2.39% | 3.41% | -0.01% |
| *Benchmark: XIUSA000MC* | *0.57%* | *2.66%* | *3.55%* | *0.02%* |
| TIAA-CREF Emerging Markets Equity Index (Inst) | -14.82% | 11.06% | 37.43% | -14.58% |
| *Benchmark: XIUSA04F2T* | *-14.91%* | *11.20%* | *37.28%* | *-14.56%* |
| TIAA-CREF Enhanced International Equity Index (Inst) | -0.65% | 0.28% | 25.90% | -16.05% |
| *Benchmark: XIUSA000PK* | *-0.82%* | *1.01%* | *25.02%* | *-13.78%* |
| TIAA-CREF Enhanced Large-Cap Growth Index | 6.74% | 8.12% | 29.64% | -3.43% |
| *Benchmark: XIUSA000KO* | *5.68%* | *7.09%* | *30.22%* | *-1.51%* |
| TIAA-CREF Enhanced Large-Cap Value Index (Inst) | -2.82% | 15.02% | 13.96% | -10.07% |
| *Benchmark: XIUSA000KP* | *-3.84%* | *17.31%* | *13.65%* | *-8.26%* |
| TIAA-CREF Equity Index (Inst) | 0.47% | 12.74% | 21.10% | -5.22% |
| *Benchmark: XIUSA000O6* | *0.47%* | *12.76%* | *21.13%* | *-5.25%* |
| TIAA-CREF Growth & Income (Inst) | 3.48% | 8.61% | 23.98% | -7.11% |
| *Benchmark: XIUSA04G92* | *1.41%* | *11.98%* | *21.84%* | *-4.38%* |
| TIAA-CREF High-Yield (Inst) | -3.72% | 16.47% | 5.66% | -2.67% |
| *Benchmark: XIUSA04ENX* | *-2.81%* | *14.77%* | *6.98%* | *-2.04%* |

| Fund | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|
| TIAA-CREF International Equity (Inst) | -1.19% | 0.42% | 32.95% | -23.44% |
| *Benchmark: XIUSA000PK* | *-0.82%* | *1.01%* | *25.02%* | *-13.78%* |
| TIAA-CREF Large-Cap Growth Index (Inst) | -0.50% | 1.23% | 25.31% | -13.25% |
| *Benchmark: XIUSA000KO* | *5.68%* | *7.09%* | *30.22%* | *-1.51%* |
| TIAA-CREF Large-Cap Value (Inst) | 5.60% | 7.04% | 30.05% | -1.55% |
| *Benchmark: XIUSA000KP* | *-3.84%* | *17.31%* | *13.65%* | *-8.26%* |
| TIAA-CREF Large-Cap Value Index (Inst) | -4.69% | 18.60% | 12.52% | -14.10% |
| *Benchmark: XIUSA000KP* | *-3.84%* | *17.31%* | *13.65%* | *-8.26%* |
| TIAA-CREF Mid-Cap Growth (Inst) | -0.63% | 1.95% | 26.21% | -8.16% |
| *Benchmark: XIUSA000KX* | *-0.20%* | *7.34%* | *25.27%* | *-4.74%* |
| TIAA-CREF Mid-Cap Value (Inst) | -5.36% | 17.41% | 11.12% | -14.16% |
| *Benchmark: XIUSA000KY* | *-4.79%* | *20.02%* | *13.34%* | *-12.27%* |
| TIAA-CREF Social Choice Bond (Inst) | 1.18% | 3.20% | 4.49% | 0.33% |
| *Benchmark: XIUSA000MC* | *0.57%* | *2.66%* | *3.55%* | *0.02%* |
| TIAA-CREF Social Choice Equity (Inst) | -2.37% | 13.50% | 20.93% | -5.52% |
| *Benchmark: XIUSA000O6* | *0.47%* | *12.76%* | *21.13%* | *-5.25%* |

**Defendants Maintained Relatively Expensive Investment Options in the Plans**

58.    Defendants also breached their fiduciary duties by allowing relatively expensive funds (many of which also underperformed) to remain in the Plans.

59.    Under trust law, one of the responsibilities of the Plans' fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs."  Restatement (Third) of Trusts, ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts, §90 cmt. B (2007) ("Cost-conscious

management is fundamental to prudence in the investment function.").  Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident" or if there is a "superior alternative investment" to any of the plan's holdings.  *Pension Benefit Gaur. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718-19 (2d Cir. 2013).

60.    As illustrated below, many of the underperforming funds were also substantially more expensive than the median cost of comparable funds in similarly sized plans (more than $1b in assets):[11]

| Fund | Expense Ratio (as of 12/31/19) | Category | ICI Median[12] |
|------|-------------------------------|----------|----------------|
| Fidelity Focused Stock | 0.88% | Equity Mutual Fund | 0.33% |
| Fidelity Export & Multinational (K) | 0.63% | Equity Mutual Fund | 0.33% |
| Fidelity Real Estate Income | 0.73% | Equity Mutual Fund | 0.33% |
| Fidelity Real Estate Investment Portfolio | 0.74% | Equity Mutual Fund | 0.33% |

61.    As shown below (amounts as of 2019, unless otherwise indicated), participants in the QRP were wasting substantial assets in many funds offered by the Plans, simply as a result of their relatively high fees:

---

[11]    *See supra*, note 4.

[12]    The median expense ratio is taken from plans with over $1b in assets, as the QRP had over $b in assets as of 2019 and the TSA had over $4b in assets as of 2019.

| Current Fund | Assets 2018 ($) | Assets 2019 ($) | Expense Ratio (%)[13] | Category | Alternative Fund | Alternative Fund Expense Ratio (%) | Excess Fees (%) | Overpayment 2018 ($) | Overpayment 2019 ($) |
|---|---|---|---|---|---|---|---|---|---|
| Fidelity Export & Multinational (K) | 7,999,337 | 10,198,458 | 0.63 | Large Value | Vanguard Value Index | 0.04 | 0.59 | 47,196 | 60,171 |
| Fidelity Real Estate Income | 3,060,484 | 2,863,048 | 0.73 | Real Estate | Vanguard Real Estate Index | 0.10 | 0.63 | 19,281 | 18,037 |
| Fidelity Real Estate Investment Portfolio | 11,475,549 | 14,029,760 | 0.74 | Real Estate | Vanguard Real Estate Index | 0.10 | 0.64 | 73,444 | 89,790 |
| Fidelity Focused Stock | 17,855,894 | 19,694,399 | 0.88 | Large Growth | Vanguard Growth Index | 0.04 | 0.84 | 149,990 | 165,433 |
| Fidelity Low-Priced Stock | 35,797,471 | 38,994,210 | 0.5 | Mid-Cap Value | Vanguard Mid-Cap Value Index | 0.07 | 0.43 | 153,929 | 167,675 |
| Fidelity OTC Portfolio | 23,281,071 | 33,753,136 | 0.78 | Large Growth | Vanguard Growth Index | 0.04 | 0.74 | 172,280 | 249,773 |
| Fidelity New Millen. | 23,788,089 | 26,737,389 | 0.55 | Large Blend | Vanguard Total Stock Mkt Id | 0.01 | 0.54 | 128,456 | 144,382 |

62.     Participants in the TSA Plan were similarly wasting assets on relatively expensive

funds (amounts as of 2019, unless otherwise indicated):

| Current Fund | Assets 2018 ($) | Assets 2019 ($) | Expense Ratio (%)[14] | Category | Alternative Fund | Alternative Fund Expense Ratio (%) | Excess Fees (%) | Overpayment 2018 ($) | Overpayment 2019 ($) |
|---|---|---|---|---|---|---|---|---|---|
| Fidelity Export & Multinational (K) | 11,803,005 | 13,263,742 | 0.63 | Large Value | Vanguard Value Index | 0.04 | 0.59 | 69,638 | 78,256 |
| Fidelity Real Estate Income | 2,909,418 | 3,115,481 | 0.73 | Real Estate | Vanguard Real Estate Index | 0.10 | 0.63 | 18,329 | 19,628 |
| Fidelity Real Estate Investment Portfolio | 13,235,531 | 16,992,564 | 0.74 | Real Estate | Vanguard Real Estate Index | 0.10 | 0.64 | 84,707 | 108,752 |

---

[13]     Expense ratios are as of September 2020.

[14]     Expense ratios are as of September 2020.

| Current Fund | Assets 2018 ($) | Assets 2019 ($) | Expense Ratio (%)[14] | Category | Alternative Fund | Alternative Fund Expense Ratio (%) | Excess Fees (%) | Overpayment 2018 ($) | Overpayment 2019 ($) |
|---|---|---|---|---|---|---|---|---|---|
| Fidelity Focused Stock | 21,659,307 | 21,069,992 | 0.88 | Large Growth | Vanguard Growth Index | 0.04 | 0.84 | 181,938 | 176,988 |
| Fidelity Low-Priced Stock | 65,998,102 | 73,005,607 | 0.5 | Mid-Cap Value | Vanguard Mid-Cap Value Index | 0.07 | 0.43 | 283,792 | 313,924 |
| Fidelity OTC Portfolio | 27,869,450 | 43,462,634 | 0.78 | Large Growth | Vanguard Growth Index | 0.04 | 0.74 | 206,234 | 321,623 |
| Fidelity New Millen. | 29,428,841 | 33,141,631 | 0.55 | Large Blend | Vanguard Total Stock Mkt Id | 0.01 | 0.54 | 158,916 | 178,965 |

63.　　The relative high cost of the underperforming funds in the Plans further reveals Defendants' disregard for preserving the Plans' assets, particularly in light of the overwhelming number of duplicative investment options already offered in the Plans.

**Defendants Failed to Prudently Set or Monitor Administrative and Recordkeeping Fees**

64.　　The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping is a necessary service for every defined contribution plan, and the market for recordkeeping services is highly competitive. There are numerous recordkeepers in the marketplace who are equally capable of providing a high level of service to large defined contribution plans, like the Plans. Recordkeepers typically vigorously compete for business and differentiate themselves by offering a lower price.

65.　　During the Class Period, Defendants failed to act in the best interest of the Plans' participants by streamlining recordkeeping services and minimizing the Plans' expenses. The Plans' fiduciaries failed to follow a prudent process when examining and negotiating Plan expenses. Instead, the Plans retained two recordkeepers which provided many overlapping and duplicative services, as illustrated by the vast number of overlapping investment options provided

by both Fidelity and TIAA. Defendants failed to follow a prudent process when overseeing the recordkeepers or the fees charged in connection with their services.

66.    Utilizing two recordkeepers for similar services resulted in recordkeepers providing duplicative services, and obscuring the Plans' expenses.  Had Defendants acted prudently and in the best interest of the Plans' participants, they would have eliminated the duplication among the recordkeepers.

67.    Additionally, the Plans' recordkeeping expenses were paid in part through a process known as revenue sharing, under which expenses were paid through fees charged by investments selected by Plan participants.  Recordkeeping expenses can either be paid by the Plan sponsor, directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing.  Revenue sharing payments are made by investments within a plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

68.    Fees charged in this manner often benefit a recordkeeper because Plan participants are investing in funds offered by the recordkeeper.  Due to the large size of the Plans, however, Defendants were able – but failed – to separate out recordkeeping fees from investments.  In other words, Defendants could have – and should have – negotiated directly with the recordkeepers over a particular amount that was to be charged for recordkeeping expenses separate and apart from which funds were selected by the Plans' participants.

69.    By separating out the recordkeeping fees, the Plans' fiduciaries could have negotiated fees that were exclusively related to the services performed as opposed to connecting the fees to investment options which benefitted the recordkeepers.  This process would also have provided greater visibility into the fees paid by the Plan.

70.     As discussed below, the Plans utilized revenue sharing during the Class Period, but MITRE's Form 5500s for the Plans do not clearly show the full amount of compensation. MITRE indicated on its Forms 5500s for the QRP that TIAA did not receive indirect compensation in 2015, 2016, or 2018, but then contradicts itself by listing indirect compensation of $9,024, $5,182, and $11,931 respectively. In the TSA, MITRE states in the 2019 Form 5500 that TIAA did not receive indirect compensation, but received $13,295 of direct compensation. Neither direct nor indirect payments to Fidelity are listed in the Form 5500s filed during the Class Period.

71.     MITRE's recordkeeping agreement with TIAA provided for both revenue sharing and direct payments.

(a)     The Recordkeeping Services Agreement, entered into on April 8, 2006 with TIAA states: "TIAA may be compensated for its services under this Agreement by payments made by providers of mutual funds, or their affiliates, used as allocation options under the Plans and from fees under the TIAA-CREF annuity contracts. This shall include sharing, on a periodic basis, in the revenue derived by such mutual fund providers and TIAA-CREF." The Agreement also states that, "in addition to charges imposed by the funds themselves, TIAA may charge administrative fees in connection with certain non-proprietary mutual funds as set forth in Schedule B of this Agreement."

(b)     The tenth amendment to the Recordkeeping Services Agreement, dated August 28, 2017, also states that: "certain proprietary and non-proprietary mutual fund investments listed in Schedule B may pay to the Plan revenue sharing payments or Plan Services Expense payments to be collected by TIAA." Schedule B, as illustrated in the ninth amendment to the Recordkeeping Services Agreement, dated March 29, 2017, provides:

**Active Plan Funding Options**

**TIAA-CREF Annuity Contract**

| Annuity Name | The annual fee TIAA receives for services (in basis points) | Ticker |
|---|---|---|
| TIAA Traditional Annuity | 15 | N/A |
| TIAA Real Estate Account | 24 | QREARX |
| CREF Bond Market Account R3 | 10 | QCBMIX |
| CREF Equity Index Account  R3 | 10 | QCEQIX |
| CREF Global Equities Account R3 | 10 | QCGLIX |
| CREF Growth Account R3 | 10 | QCGRIX |
| CREF Inflation-Linked Bond | 10 | QCILIX |
| CREF Money Market Account R3 | 10 | QCMMIX |
| CREF Social Choice Account R3 | 10 | QCSCIX |
| CREF Stock Account R3 | 10 | QCSTIX |

72.     The Recordkeeping Agreement between MITRE and Fidelity, dated February 5, 1999, states in Schedule B that there is no "annual participant fee" and no "account establishment fee[.]"  In the third amendment to the Recordkeeping Agreement, dated February 14, 2011, Schedule B was amended to state that a 0.04% per annum fee "shall accrue to Fidelity Management Trust Company ("FMTC"), as Trustee, with respect to assets of the Managed Income Fund managed by FMTC, excluding assets invested in the Liquidity Component[.]"  Schedule B was further amended on January 31, 2012, providing for a "Revenue Credit Account," to which Fidelity would "make a payment in the amount of $3,620,000 annually" to be spread across the Plans "pro rata based on each Plan's assets as of the prior month end[.]"  The Plan Administrator or Sponsor "may direct Fidelity to use amounts held in the Revenue Credit Account to reimburse the Sponsor for fees and expenses associated with services provided to the Plan, or pay such vendors, including Fidelity or third parties, directly." The amount and extent of Fidelity's compensation is unclear based on MITRE's Form 5500s and Recordkeeping Agreement.

73.    Direct payments to TIAA, such as the $13,295 paid to TIAA in 2019, were entirely unnecessary while revenue sharing was enabled for both recordkeepers.  Indirect payments through revenue sharing benefitted TIAA, whose funds dominated the investment lineup, but provided no benefit to the Plans' participants.  The Plans also inexplicably chose to retain two recordkeepers, providing duplicative services, and obscuring the Plan's payments to Fidelity, further costing the Plans' participants.  Had Defendants acted prudently and in the best interest of the Plans' participants, they would have eliminated those unnecessary payments to TIAA based on a percentage of the Plans' assets, and selected one recordkeeper.

**Defendants Acknowledged the Pre-existing Problems with the Plans by Restructuring the Plans in 2021**

74.    During the Fall of 2020, Defendants announced structural changes to the Plans that became effective as of January 1, 2021.  Several of the changes appear to have been adopted in an effort to correct problems existing at the time which were caused by Defendants' failures to adhere to their fiduciary duties, as alleged above.  The changes included a substantial reduction in the number and simplification of investment options offered to the Plans' participants.  Additionally, the Plans separated out the payment of recordkeeping fees from the investment options and established a fixed fee per participant for recordkeeping services.

75.    With respect to investment options, the Plans implemented a new investment structure, whereby participants were prompted to choose new investment options from a "new investment lineup"[15] between October 26, 2020 and December 15, 2020, or future contributions

---

[15]    *See Retirement Program Transition Guide*, MITRE, at 5 (2020), https://www.mitre.org/oe.

and existing MITRE Retirement Plan balances would be "directed to a target date fund within your chosen investment services provider [Fidelity or TIAA]."[16]

76.    Notably, the imprudent funds identified above, including the Fidelity sector-specific funds, as well as numerous funds that underperformed before and during the Class Period, and numerous relatively expensive funds, were entirely removed from the Plans.  Apparently, in connection with the restructuring of the Plans, Defendants engaged in a more careful review and analysis of the Plans' investment options.  Had Defendants complied with their fiduciary duties prior to this time they would have removed those funds much earlier or they would not have included them at all.

77.    Even though certain positive changes were made to the Plan, the Plans continued to be structured in a way to benefit Fidelity and TIAA as opposed to in a manner to solely benefit the Plans' participants.   Instead of selecting a prudent assortment of investment options, Defendants set up the Plans such that Fidelity and TIAA "will continue to be investment providers to which [participants] can direct [their] contributions."[17]   The new investment structure of the Plans includes four "tiers" including: Tier 1 (Target Retirement Date Funds); Tier 2 (Core Mutual Funds); Tier 3 (Core Annuities); and Tier 4 (Self-Directed Brokerage Account).  Participants are able to choose investments from one or multiple tiers, but were required to choose between investing with Fidelity or TIAA.

78.    In Tier 1, Fidelity offers 14 target date funds, and TIAA offers 12 target date funds. In Tier 2, Fidelity offers 22 "core mutual funds" and TIAA offers 19 "core mutual funds."  Even though the Plans somewhat simplified the investment options, the Plans continue to unnecessarily

---

[16]      *Id.*

[17]      *Id.*

offer duplicative investments. Fidelity and TIAA offer many similar funds in their lineups, with 9 overlapping, including Invesco Oppenheimer Discovery Mid Cap Growth Y, JPMorgan Equity Income Class R6, MFS Growth Class R3, Parnassus Core Equity Investor Shares, PGIM High Yield Class R6, PGIM Total Return Bond R6, Vanguard Treasury Money Market Fund Investor Shares, Wells Fargo Special Mid Cap Value A, and Wells Fargo Special Small Cap Value A.

79.    With respect to the Plans' recordkeeping and administrative fees, Defendants also address some of the problems caused by their breaches of fiduciary duty. Fidelity was selected as "the primary provider of recordkeeping services for enrollment in the Plans, changes to contributions, and investment provider elections for the Plans."[18]

80.    Moving away from the revenue sharing fee structure, the updated Plan materials explained that recordkeeping costs would now be "deducted directly from your account."[19]

(a)    The Fidelity option specifies that beginning on January 1, 2021, a quarterly recordkeeping fee would be "deducted from participant accounts to cover the Plan's recordkeeping costs" and that the "new fee will be $51 per year ($12.75 deducted quarterly) for all participants." Additionally, MITRE "will assess a fee of approximately $10 per year ($2.50 deducted quarterly) for additional administrative services for each participant with an account balance in the Plan."[20]

(b)    The TIAA option specifies that beginning on January 1, 2021, "an annual Plan servicing fee of up to 0.027% ($0.27 per $1,000 invested) will be deducted proportionally

---

[18]    *Id.* at 17.

[19]    *Id.* at 16.

[20]    *Id.*

from your investments on a quarterly basis" and that "[e]ach fee (or credit) will be applied to your account on the last business day of each quarter[.]"[21]

81.     The updated Plan materials explained that "these fees will change to provide you with more transparency into your portfolio."[22]  By separately negotiating recordkeeping and other fees, Defendants have implicitly acknowledged that this approach is in the best interests of the Plans' participants.

## CLASS ACTION ALLEGATIONS

82.     Plaintiff brings this action in a representative capacity on behalf of the Plans and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and the Classes defined as follows:

> All participants in or beneficiaries of the MITRE Tax Sheltered Annuity Plan from September 4, 2015 to December 31, 2020.  Excluded from the Class are: (i) Defendants and their families; (ii) any fiduciaries of the Plan; (iii) the officers and directors of MITRE and any entity in which MITRE has or had a controlling interest during the Class Period; and (iv) members of the immediate families and their legal representatives, heirs, successors or assigns of any such excluded party.

> All participants in or beneficiaries of the MITRE Qualified Retirement Plan from September 4, 2015 to December 31, 2020.  Excluded from the Class are: (i) Defendants and their families; (ii) any fiduciaries of the Plan; (iii) the officers and directors of MITRE and any entity in which MITRE has or had a controlling interest during the Class Period; and (iv) members of the immediate families and their legal representatives, heirs, successors or assigns of any such excluded party.

83.     The members of the Classes are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of January 1, 2019, the TSA had over 16,600 participants and the QRP had over 12,125 participants.

---

[21]    *Id.*

[22]    *Id.*

84.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Classes, which predominate over questions that may affect individual class members, include, *inter alia*:

(a)     whether Defendants are fiduciaries of the Plans;

(b)     whether Defendants breached their fiduciary duties of prudence with respect to the Plans;

(c)     whether Defendants had a duty to monitor other fiduciaries of the Plans;

(d)     whether Defendants breached their duty to monitor other fiduciaries of the Plans; and

(e)     the extent of damage sustained by members of the Classes and the appropriate measure of damages.

85.     Plaintiff's claims are typical of those of the Classes because her claims arise from the same event, practice and/or course of conduct as other members of the Classes.

86.     Plaintiff will adequately protect the interests of the Classes and has retained counsel experienced in class action litigation in general and ERISA class actions involving fiduciary breaches in particular.

87.     Plaintiff has no interests that conflict with those of the Classes.  Defendants do not have any unique defenses against Plaintiff that would interfere with her representation of the Classes.

88.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be too small for individual members to enforce their rights through individual actions, and the common questions of law and

fact predominate over individual questions.  Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiff is not aware of any difficulties likely to be encountered in the management of this matter as a class action.

## COUNT I

### Breach of Fiduciary Duties of Prudence
### Against All Defendants

89.    Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

90.    All defendants were fiduciaries of the Plans under ERISA §§3(21) and/or 402(a)(1), 29 U.S.C. §§1002(21) and/or 1102(a)(1).

91.    MITRE was a fiduciary of the Plans under ERISA §§3(21) and/or 402(a)(1), 29 U.S.C. §§1002(21) and/or 1102(a)(1) because it was designated in the Plans' documents as the Plan Administrator, was a named fiduciary under the Plans, performed discretionary Plan-related fiduciary functions, including the selection and monitoring of investment options for the Plans, and the negotiation over services and fees for the Plans, and was responsible for the administration and operation of the Plans.

92.    The MITRE Executive Defendants were fiduciaries of the Plans under ERISA §3(21), 29 U.S.C. §1002(21) because each, upon information and belief, served as fiduciaries under the Plans, exercised discretionary authority over the management or disposition of the Plans' assets, and/or designated other persons to administer aspects of the Plans.

93.    The MITRE Board of Trustees Defendants were fiduciaries of the Plans under ERISA §3(21), 29 U.S.C. §1002(21) because they, upon information and belief, served as fiduciaries under the Plans, exercised discretionary authority over the management or disposition of the Plans' assets, and/or designated other persons to administer aspects of the Plans.

94.    As fiduciaries of the Plans, Defendants were required, pursuant to ERISA §404(a)(1), 29 U.S.C. §1104(a)(1), to act: "(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan"; and "(B) to discharge [their duties] with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims[.]"

95.    ERISA's duty of prudence required Defendants to give appropriate consideration to those facts and circumstances that, given the scope of their fiduciary investment duties, they knew or should have known were relevant to the particular investments of the Plan and to act accordingly. *See* 29 C.F.R. §2550.404a-1. The Supreme Court has concluded that this duty is "a continuing duty to monitor [plan] investments and remove imprudent ones." *Tibble*, 575 U.S. at 529.

96.    As described above, Defendants failed to act prudently and in the best interest of the Plans and their participants and breached their fiduciary duties in various ways. Defendants failed to make decisions regarding the Plans' investment lineups based solely on the merits of each investment and what was in the best interest of Plan participants. Defendants selected and retained investment options in the Plans despite their poor performance and high cost relative to other comparable investments. A prudent fiduciary in possession of this information would have removed these investment options, and replaced them with more prudent and lower cost alternatives. Defendants also maintained an imprudent administrative and recordkeeping fee structure, allowing participant payments to third party service providers both directly and indirectly (through revenue sharing), and selecting more than one recordkeeper for the Plans.

97.     Through these actions and omissions, Defendants failed to discharge their duties with respect to the Plans failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B).

98.     Defendants knowingly participated in each fiduciary breach of the other defendants, knowing that such acts were a breach, and enabled the other defendants to commit fiduciary breaches by failing to lawfully discharge their own duties.  Defendants knew of the fiduciary breaches of the other defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each defendant is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. §1105(a).

99.     As a direct and proximate result of these breaches, the Plans, Plaintiff and members of the Classes suffered substantial losses in the form of higher fees or lower returns on their investments than they would have otherwise experienced.  Additionally, and regardless of the losses incurred by Plaintiff or any member of the Classes, pursuant to ERISA §§502(a)(2)-(a)(3) and 409(a), and 29 U.S.C. §§1132(a)(2)-(a)(3) and 1109(a), Defendants and any non-fiduciary which knowingly participated in these breaches are liable to disgorge all profits made as a result of Defendants' breaches of the duty of prudence, and such other appropriate equitable relief as the Court deems proper.

## COUNT II

### Breach of Fiduciary Duties in Violation of Duty to Monitor
### Against All Defendants

100.     Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

- 41 -

101.    Defendant MITRE had overall oversight responsibility for the Plans and control over the Plan's investment options through its authority to limit or remove the other fiduciary defendants.   MITRE, upon information and belief, designated the administrator to receive investment directions for the Plans, and delegated certain responsibilities of the Plans, to the MITRE Executive Defendants, who delegated certain responsibilities to Fidelity and TIAA. MITRE had a fiduciary responsibility to monitor the performance of the fiduciaries operating under them.

102.    The MITRE Board of Trustees Defendants had oversight responsibility for the Plans and control over the Plan's investment options through its authority to limit or remove the other fiduciary defendants.  The MITRE Board of Trustees Defendants, upon information and belief, delegated certain responsibilities of the Plans to Fidelity and TIAA.  The MITRE Board of Trustees Defendants had a fiduciary responsibility to monitor the performance of the fiduciaries operating under them.

103.    The MITRE Executive Defendants had oversight responsibility for the Plans and control over the Plan's investment options through its authority to limit or remove the other fiduciary defendants.  The MITRE Executive Defendants, upon information and belief, delegated certain responsibilities of the Plans to the MITRE Board of Trustees Defendants, Fidelity, and TIAA.   The MITRE Executive Defendants had a fiduciary responsibility to monitor the performance of the fiduciaries operating under them.

104.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and monitoring of plan assets, and must take prompt and effective action to protect the Plans and participants when the monitored fiduciaries fail to perform their fiduciary obligations in accordance with ERISA.

105.    MITRE also had a duty to ensure that the fiduciary Defendants possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plans' investments; and reported regularly to MITRE.

106.    MITRE breached its fiduciary monitoring duties by, among other things:

(a)    failing to monitor and evaluate the performance of other fiduciary defendants or have a system in place for doing so, standing idly by as the Plans suffered losses as a result of other defendants' election to allow too many investment options to remain in the Plans, including a significant number of imprudent investments;

(b)    failing to monitor the processes by which the Plans' investments were evaluated, which would have alerted a prudent fiduciary to the underperformance of funds in the Plans to the substantial detriment of the Plans and the participants' retirement savings, including Plaintiff and members of the Classes;

(c)    failing to monitor the processes by which the Plans' service providers were selected and maintained, and by which administrative and recordkeeping fees were determined; and

(d)    failing to remove fiduciaries whose performance was inadequate, as they continued to maintain excessively costly investments in the Plans, all to the detriment of the participants' retirement savings.

107.    As a direct and proximate result of these breaches of the duty to monitor, the Plans, Plaintiff, and members of the Classes suffered millions of dollars of losses.  Had MITRE complied

with its fiduciary obligations, the Plans would not have suffered these losses, and participants in the Plans would have had more money available to them for their retirement.

108.    Pursuant to ERISA §502(a)(2) and (a)(3), and ERISA §409(a), 29 U.S.C. §1132(a)(2) and (a)(3), and 29 U.S.C. §1109(a), Defendants are liable to disgorge all fees received from the Plans, directly or indirectly, and profits thereon, and restore all losses suffered by the Plans caused by their breaches of the duty to monitor, and such other appropriate equitable relief as the Court deems proper.

## ENTITLEMENT TO RELIEF

109.    By virtue of the violations set forth in the foregoing paragraphs, Plaintiff and the members of the Classes are entitled to sue each of the fiduciary Defendants pursuant to ERISA §502(a)(2), 29 U.S.C. §1132(a)(2), for relief on behalf of the Plans as provided in ERISA §409, 29 U.S.C. §1109, including for recovery of any losses to the Plans, the recovery of any profits resulting from the breaches of fiduciary duty, and such other equitable or remedial relief as the Court may deem appropriate.

110.    By virtue of the violations set forth in the foregoing paragraphs, Plaintiff and the members of the Classes are entitled, pursuant to ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), to sue any of the Defendants for any appropriate equitable relief to redress the wrongs described above.

## PRAYER FOR RELIEF

111.    WHEREFORE, Plaintiff prays for judgment as follows:

A.    Declaring that each of the Defendants who are fiduciaries of the Plans have breached their fiduciary duties under ERISA;

B.    Ordering each fiduciary found to have breached his/her/its fiduciary duties to the Plans to jointly and severally restore all losses to the Plans that resulted from the breaches of fiduciary duty, or by virtue of liability pursuant to ERISA §405;

C.      Entering an order requiring: (i) the disgorgement of profit made by any Defendant; (ii) declaring a constructive trust over any assets received by any breaching fiduciary in connection with his/her/its breach of fiduciary duties, or violations of ERISA, or any non-fiduciary Defendant who knowingly participated in that breach or violation; (iii) requiring the Plans to divest themselves of investments in the imprudent investment options; and (iv) any other appropriate equitable monetary relief, whichever is in the best interest of the Plans;

D.      Ordering, pursuant to ERISA §206(d)(4), 29 U.S.C. §1056(d)(4), that any amount to be paid to or necessary to satisfy any breaching fiduciary's liability can be satisfied, in whole or in part, by attaching their accounts in or benefits from the Plans;

E.      Removing any breaching fiduciaries as fiduciaries of the Plans and permanently enjoining them from serving as a fiduciary of any ERISA-covered plan in which Plaintiff or any member of the Class is a participant or beneficiary;

F.      Appointing an independent fiduciary, at the expense of the breaching fiduciaries, to administer the Plans and the management of the Plans' investments and/or selection of investment options and/or to oversee the divestment of the Plans' investments;

G.      Ordering the Plans' fiduciaries to provide a full accounting of all fees paid, directly or indirectly, by the Plans;

H.      Awarding Plaintiff and the Classes their attorneys' fees and costs pursuant to ERISA §502(g), 29 U.S.C. §1132(g), the common benefit doctrine and/or the common fund doctrine;

I.      Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest;

J.      Awarding such equitable, injunctive or other relief as the Court may deem appropriate pursuant to ERISA §502(a)(3) or any relief to which Plaintiff and the Classes are entitled to pursuant to Fed. R. Civ. P. Rule 54(c); and

K.      Awarding such equitable, injunctive or other relief as the Court may deem just and proper.

DATED:  September 3, 2021                          */s/ Jason M. Leviton*

Jason M. Leviton
BLOCK & LEVITON LLP
260 Franklin Street, Suite 1860
Boston, MA  02110
Tel: (617) 398-5600
Fax: (617) 507-6020
jason@blockleviton.com

*Liaison Counsel for Plaintiff*

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
EVAN J. KAUFMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
ekaufman@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SARAH E. DELANEY
420 Lexington Avenue, Suite 1832
New York, NY  10170
Telephone: 212/432-5100
sdelaney@rgrdlaw.com

*Counsel for Plaintiff*